2026 Tex. Bus. 49



THE BUSINESS COURT OF TEXAS
ELEVENTH DIVISION

|  |  |  |
|---|---|---|
| VILLAGE CROSSING, LLC, | § § § § | |
| *Plaintiff,* | | |
| v. | § § § | Cause No. 25-BC11B-0088 |
| WEST CREEK INVESTMENTS, LLC, | § § | |
| *Defendant.* | § | |

═══════════════════════════════════════════════

**MEMORANDUM OPINION AND ORDER GRANTING PLAINTIFF'S
TRADITIONAL MOTION FOR SUMMARY JUDGMENT**

═══════════════════════════════════════════════

**SUMMARY OF THE DISPUTE**

¶ 1.    Before the Court is Plaintiff Village Crossing, LLC's ("Village Crossing") Traditional Motion for Summary Judgment (the "Motion"), filed June 2, 2026; the Response of Defendant West Creek Investments, LLC ("West Creek") (the "Response"), filed June 23, 2026; and Village Crossing's Reply in Support (the "Reply"), filed June 30, 2026. The Court heard oral argument on July 8, 2026.

¶ 2.    This case concerns a failed real estate transaction and, at bottom, a dispute over how much power a buyer's surveyor has to redefine what was actually

purchased. Village Crossing agreed to sell, and West Creek agreed to buy, approximately 11.56 acres of commercial property in Rosenberg, Texas, for a price of $11.75 per square foot. That acreage was not uniform in value; instead, the transaction combined 10.46 acres of interior property with 1.1 acres of higher-value frontage along U.S. Highway 59. By combining the two, the parties arrived at a single blended price of $11.75 per square foot for the entire 11.56-acre purchase. The agreement defines this total acreage as "the Land."

¶ 3.    The difficulty is that the agreement did not adequately describe the boundaries of the Land. The agreement's Exhibit A labeled the frontage component as "+/- 1.1 AC" but visually outlined a larger tract containing 2.0644 acres. It also failed to supply a definitive northern boundary of the interior acreage. Exhibit A explicitly acknowledged that its description "may be legally insufficient" and provided that a future survey commissioned by West Creek would serve as the legal description of the property. Section 5.2 required that survey "to compute the number of gross square feet in the Land."

¶ 4.    The added difficulty is that West Creek's surveyor included land well beyond the contemplated 11.56 acres. The surveys depicted the entire 2.0644-acre frontage tract and 11.5047 acres of interior property. The frontage survey thus added 0.9644 acres beyond the 1.1 acres used to price the transaction, while the interior survey added another 1.0447 acres by extending the northern boundary into

adjoining property. Together, the surveys claimed 13.5691 acres. After Village Crossing objected, West Creek insisted the agreement made its surveys controlling and that whatever property its surveyor drew became, by definition, "the Land."

¶ 5.    West Creek has since retreated from its original position. It no longer seeks to enforce the agreement as to the full 13.5691 acres. Instead, it concedes "some ambiguity" in the description of the interior acreage but argues that the frontage can be salvaged. It asks the Court to sever the 2.0644-acre frontage tract from the wreckage and to order Village Crossing to convey that parcel alone at the blended rate of $11.75 per square foot—a rate originally calculated based on a much larger purchase consisting predominantly of lower-value interior acreage.

¶ 6.    As explained below, both of West Creek's arguments—the original and the fallback—fail because the contract reflects a single, indivisible bargain for one defined property. The agreement defines one "Land" to be conveyed for one price, secured by one earnest-money deposit, and completed through one deed at one closing. The parties never treated the frontage and interior acreage as separate purchases or assigned them stand-alone prices. Neither a survey nor a severability clause can now restructure their bargain on terms the agreement does not contain.

¶ 7.    The agreement is therefore unenforceable for two separate but related reasons. First, it is indefinite because it does not identify the full boundaries of the single property the parties agreed to convey. Second, it violates the statute of frauds

because neither the agreement nor any existing writing incorporated into it furnishes the means to identify that property with reasonable certainty. The promise of a future survey cannot cure either defect.

¶ 8.    Alternatively, even if the agreement were enforceable, Section 5.2 required West Creek to commission a survey of "the Land"—the approximately 11.56-acre property defined by Section 2.1. It did not permit West Creek to claim additional acreage from Village Crossing's adjoining property. By delivering surveys totaling 13.5691 acres, insisting that those surveys controlled, and refusing to cure after notice, West Creek materially breached the agreement, allowing Village Crossing to properly terminate it.

¶ 9.    Accordingly, having considered the parties' briefing, the summary-judgment record, the arguments of counsel, and the applicable law, the Court **GRANTS** the Motion and **SUSTAINS IN PART** Village Crossing's evidentiary objections for the reasons that follow.

## BACKGROUND

¶ 10.  This dispute traces back to a Purchase and Sale Agreement dated April 8, 2025 (the "Agreement"), under which Village Crossing agreed to sell and West Creek agreed to buy commercial real estate in Fort Bend County, Texas.[1] Section 2.1 defines the property to be conveyed as "the Land," consisting of "approximately

---

[1] Pl.'s Ex. A-1 (Agreement).

11.56 +/- acres of land" as depicted in Exhibit A to the Agreement. Section 5.2 requires West Creek to commission a new survey "to compute the number of gross square feet in the Land." The purchase price is calculated at $11.75 multiplied by the surveyed square footage of the Land.[2]

¶ 11.   Before negotiations even began, Village Crossing had mapped out its larger development on the site. A recorded plat identified a frontage parcel along U.S. 59 as "Tract 5F," containing 2.0644 acres.[3] A separate site plan identified an adjoining 10.46-acre interior tract as "Commercial M."[4] Commercial M was bounded on the north by two additional tracts—Reserve P (5.02 acres) and Reserve Q (2.89 acres)—that Village Crossing did not intend to include in this transaction.[5] These tract labels appear only within Village Crossing's planning documents; the Agreement does not use them, nor does it separately define or price the frontage and interior components.

¶ 12.   Instead, the Agreement describes a single purchase of approximately 11.56 acres at a single price of $11.75 per square foot.[6] The summary-judgment record reflects how the parties arrived at that rate. Their calculation assumed a purchase of 10.46 acres of interior land together with 1.1 acres of frontage. The two

---

[2] *Id.* § 5.2.
[3] Pl.'s Ex. A (Alattar Decl.) ¶ 3; Pl.'s Ex. A-3 at p. 2.
[4] Alattar Decl. ¶ 2; Pl.'s Ex. A-2.
[5] Alattar Decl. ¶ 2; Pl.'s Ex. A-2.
[6] Alattar Decl. ¶ 6; Agreement § 1.1.3.

components carried vastly different market values. Village Crossing valued the frontage at $24 per square foot, while West Creek valued it at $26.[7] Both valuations substantially exceeded the value assigned to the interior property. By combining 10.46 acres of lower-value interior land with 1.1 acres of higher-value frontage, the parties arrived at the $11.75 blended rate for the full 11.56-acre transaction. [8] The record contains no evidence the parties ever discussed a sale of the frontage property alone, much less a sale of that premium land at the discounted blended rate.

¶ 13. Exhibit A to the Agreement—a marked-up version of Village Crossing's marketing flyer—foreshadowed the trouble to come.[9] It depicts the property to be conveyed on a single drawing. The frontage portion is labeled "+/- 1.1 AC," but the boundary lines drawn on the flyer outline the entire 2.0644-acre Tract 5-F. There is no line identifying which 1.1 acres within that larger tract were to be conveyed. The Agreement thus sends two conflicting signals: an acreage call for 1.1 acres and visual boundary lines corresponding to a tract nearly twice that size.

¶ 14. Exhibit A does not purport to resolve the contradiction. It openly acknowledges that its property description "may be legally insufficient" and promises that a future survey "shall become the legal description of the Property" and "shall replace this Exhibit A in its entirety." This provision is central to the

---

[7] Alattar Decl. ¶ 10; Pl.'s Ex. B at p. 3 (Interrogatory No. 1).
[8] Alattar Decl. ¶ 10; Pl.'s Ex. B at p. 3 (Interrogatory No. 1).
[9] Alattar Decl. ¶ 4;Ex. A to Agreement.

parties' dispute. West Creek sees it as authority for the surveyor to complete—or even redefine—the property description. Village Crossing sees it as an unenforceable attempt to postpone an agreement on an essential contract term.

¶ 15.  During the summer of 2025, West Creek delivered two surveys.[10] The first depicted the entire 2.0644-acre frontage tract rather than the 1.1 acres referenced in Exhibit A.[11] The second depicted an 11.5047-acre interior tract instead of the 10.46 acres reflected in Village Crossing's planning materials and the parties' pricing calculation.[12] The surveyor achieved this larger interior acreage by extending Commercial M into portions of Reserve P and Reserve Q.[13] Together, the surveys encompassed 13.5691 acres—two acres beyond the approximately 11.56 acres defined as "the Land."

¶ 16.  Village Crossing objected, asserting that the surveys did not depict the property the parties had agreed to sell.[14] West Creek's response was not to revise the surveys but to deny that Village Crossing had any say in the matter.[15] West Creek maintained that whatever its surveyor drew necessarily became "the Land."[16] On October 1, 2025, Village Crossing served a notice of default, triggering the three-

---

[10] Alattar Decl. ¶¶ 8–9; Pl.'s Exs. A-6, A-7.
[11] Alattar Decl. ¶ 9; Pl.'s Ex. A-7.
[12] Alattar Decl. ¶ 8; Pl.'s Ex. A-6.
[13] Alattar Decl. ¶ 9.
[14] *Id.* ¶ 11; Pl.'s Ex. A-8.
[15] Alattar Decl.  ¶ 12; Pl.'s Ex. A-9.
[16] Pl.'s Ex. A-9.

day cure period in Section 10.1.[17] West Creek responded by redelivering the same surveys and reiterating its interpretation of the Agreement.[18]

¶ 17.  Village Crossing terminated the Agreement on October 7, 2025.[19] This litigation followed.

## LEGAL STANDARD

¶ 18.  Summary judgment is governed by Texas Rule of Civil Procedure 166a. A movant "bears the burden to show that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law."[20] The nature of that burden varies by posture. A plaintiff must conclusively establish all essential elements of its claim.[21] A defendant must either conclusively negate at least one element of the plaintiff's claim or prove all elements of an affirmative defense.[22]

¶ 19.  In deciding whether a fact issue exists, a court takes as true all evidence favorable to the nonmovant, indulges every reasonable inference in the nonmovant's favor, and resolves any doubts against the movant.[23] The court may not weigh the evidence or resolve credibility determinations at this stage; its role is limited to deciding whether a genuine fact issue exists for trial. [24]

---

[17] Alattar Decl. ¶ 15; Pl.'s Ex. A-12.

[18] Alattar Decl. ¶ 15.

[19] *Id.* ¶ 16; Pl.'s Ex. A-13.

[20] *ConocoPhillips Co. v. Koopmann*, 547 S.W.3d 858, 865 (Tex. 2018) (citing TEX. R. CIV. P. 166a(c)).

[21] *See MMP, Ltd. v. Jones*, 710 S.W.2d 59, 60 (Tex. 1986) (per curiam).

[22] *Stanfield v. Neubaum*, 494 S.W.3d 90, 96 (Tex. 2016).

[23] *ConocoPhillips*, 547 S.W.3d at 865.

[24] *Huckabee v. Time Warner Ent. Co. L.P.*, 19 S.W.3d 413, 422–23 (Tex. 2000); *see also Ortega v. Pean*, No. 01-18-00249-CV, 2019 WL 1560859, at *10 (Tex. App.—Houston [1st Dist.] Apr. 11, 2019, pet. denied)

¶ 20. Questions of contract interpretation are especially well suited for summary judgment.[25] In construing a contract, the Court's objective is to ascertain and give effect to the parties' intent as expressed in the agreement itself.[26] To do so, the Court considers the contract as a whole, harmonizing and giving effect to all provisions so that none are rendered meaningless.[27]

¶ 21. This analysis begins—and, where the language permits, ends—with the contract's plain text.[28] If the language is susceptible to a definite or certain legal interpretation, it is unambiguous and must be enforced as written.[29]

## ANALYSIS

### A.    The Agreement is a single contract for the sale of a single, unified "Land."

¶ 22. Before reaching the arguments on indefiniteness and the statute of frauds, the Court must answer a more basic question of contract interpretation: what exactly did the Agreement obligate Village Crossing to sell? If the parties agreed to two separate conveyances, one might survive even if the other fails. If they agreed

---

(mem. op.) ("[I]f a summary judgment motion involves the credibility of affiants, or the weight to be given to evidence, the motion should not be granted." (internal quotation marks omitted)).

[25] *See Hallmark v. Port/Cooper-T. Smith Stevedoring Co.*, 907 S.W.2d 586, 590 (Tex. App.—Corpus Christi-Edinburg 1995, no writ); *Tellepsen Builders, L.P. v. Kendall/Heaton Assocs., Inc.*, 325 S.W.3d 692, 696 (Tex. App.—Houston [1st Dist.] 2010, pet. denied).

[26] *Italian Cowboy Partners v. Prudential Ins.*, 341 S.W.3d 323, 333 (Tex. 2011); *J.M. Davidson, Inc. v. Webster*, 128 S.W.3d 223, 229 (Tex. 2003).

[27] *Italian Cowboy*, 341 S.W.3d at 333.

[28] *Id.* (citing *Progressive Cnty Mut. Ins. Co. v. Kelley,* 284 S.W.3d 805, 807 (Tex. 2009) (per curiam)).

[29] *J.M. Davidson*, 128 S.W.3d at 229; *Coker v. Coker*, 650 S.W.2d 391, 393 (Tex. 1983).

instead to one integrated conveyance of one defined property, the Court must evaluate that bargain as the parties made it.

¶ 23.  The question is the whole of West Creek's remaining case. West Creek now concedes "some ambiguity" in the description of the interior acreage, but argues that the defect should be confined there.[30] Invoking *Morrow v. Shotwell*[31] and Section 12.3 of the Agreement, it asks the Court to sever the 2.0644-acre frontage parcel and compel Village Crossing to convey that piece alone—at the discounted blended rate that was supposed to apply to the whole 11.56 acres.[32] Whether the Court can do so depends on whether the Agreement created two sales or one.

¶ 24.  The Agreement answers that question in unmistakably singular terms. Section 2.1 defines one object of conveyance—"the Land"—consisting of "approximately 11.56 +/- acres." Nowhere does the Agreement define "Commercial M" or "Tract 5-F" as separate items of sale. Section 5.2 calls for "a new survey"— singular—to compute the square footage of "the Land," not separate surveys of separately defined parcels. Section 1.1.3 establishes one purchase price formula: $11.75 per square foot of "the Land." And Section 1.1.4 backs the transaction with

---

[30]Resp. ¶ 18 ("[E]ven accepting some ambiguity, that ambiguity concerns only the Back Property."); *see also* Resp. ¶¶ 19–25; Hearing Tr. 28:11–15 ("But what we do know is we have two separate tracts that one can be clearly identified. And, so, we have a severability issue here . . . ."), 32:23–33:1 ("[The contract] was originally for the sale of two different tracts. One of them has now failed for a lack of legal sufficiency. One is legally defined."), 35:2–3 ("I understand that our arguments have changed before I got involved in the case.").

[31] 477 S.W.2d 538 (Tex. 1972).

[32] Resp. ¶ 24.

a single earnest money deposit of $55,000. Nothing in the Agreement contemplates two independent sales, each capable of closing without the other.

¶ 25.  There is, in short, no single clause that provides the definitive answer, but every operative provision points in the same direction. Section 2.1 defines one property. Section 5.2 requires one survey of that property. Section 1.1.3 supplies one price for it. Section 7.3.1 contemplates one deed, and Section 10.1 provides one default-and-cure procedure. Read front to back, the Agreement describes a single, unified transaction—not a pair of independent sales merely sharing a signature page.

¶ 26. Nor can this consistently singular architecture be dismissed as a drafting oversight. These are sophisticated commercial parties that well understand how to structure a divisible deal when they want one. They could have defined the frontage and interior acreage separately, assigned a separate price to each, required separate surveys and deeds, or provided that the failure of one tract would not affect the other. They did none of those things.

¶ 27.  That is what separates this case from *Morrow*, on which West Creek heavily leans. The contract there expressly identified two separate objects of sale, denominated "FIRST TRACT" and "SECOND TRACT."[33] Because the contract treated the parcels separately, the litigation did too. The trial court ordered specific performance of both, the court of appeals affirmed as to the First Tract but rendered

---

[33] *Morrow*, 477 S.W.2d at 539.

judgment against the purchaser on the Second, and neither side questioned the bifurcated treatment in the Supreme Court.[34] *Morrow* thus did not decide a contested question of severability, much less authorize a court to judicially carve up an integrated transaction whose text, structure, and consideration treat the property as a single whole. If anything, *Morrow* illustrates what is missing here: explicit language showing that the parties themselves regarded the properties as separate tracts capable of separate enforcement.

¶ 28. Section 12.3—the Agreement's boilerplate savings clause—does not fill that void. While that provision may operate to preserve "the remainder of this Agreement" if "any portion" is found invalid, a severability clause is not a magic wand. It can only salvage a bargain that remains commercially coherent once the offending provision is stripped away. What it cannot do is invent a new object of sale, apportion indivisible consideration, or manufacture a price the parties themselves never negotiated.[35] Because the defect here goes to the core description

---

[34] *Id.*

[35] Other cases have recognized that severance cannot apply if the remainder of the contract depends on the severed portion and the severed portion is an integral part of the whole contract. *See, e.g.*, *In re Poly-Am., L.P.*, 262 S.W.3d 337, 360 (Tex. 2008) ("An illegal or unconscionable provision of a contract may generally be severed so long as it does not constitute the essential purpose of the agreement. Whether or not the invalidity of a particular provision affects the rest of the contract depends upon whether the remaining provisions are independent or mutually dependent promises, which courts determine by looking to the language of the contract itself." (citations omitted)); *John R. Ray & Sons, Inc. v. Stroman*, 923 S.W.2d 80, 87 (Tex. App.—Houston [14th Dist.] 1996, writ denied) (finding that covenant not to compete could not be severed from employment agreement because the issuance of stock to employee—as set forth in the employment agreement—was mutually dependent on employee's promise not to compete). Here, severance of the sale of Commercial M would be independently inappropriate because the consideration and price the parties agreed to for the entire 11.56 acres were dependent on the sale including both Commercial M and Tract 5-F.

of the single asset under contract, any attempt at severance would leave the remaining tract entirely without a negotiated price—an integral part of the sale.[36] There is simply no independent bargain left for Section 12.3 to save.

¶ 29.  The inequity of West Creek's requested relief brings the problem into sharper focus. At the blended rate of $11.75 per square foot, the entire 2.0644-acre frontage parcel would change hands for approximately $1.057 million.[37] Yet, by West Creek's own admission, that property is actually valued at $26 per square foot,[38] amounting to roughly $2.338 million. West Creek is thus asking the Court to hand it premium highway frontage at a $1.28 million discount, exploiting a blended rate that was negotiated solely on the condition that it would also purchase more than ten acres of less valuable interior property. The Court declines to do so.

## B.    Because the Agreement defines one parcel, its failure to describe that property as a whole renders the Agreement indefinite.

¶ 30.  An enforceable contract requires mutual assent to all essential terms.[39] For an agreement to sell real property, no term is more basic than the identity of the property itself.[40]  The relevant inquiry is therefore not whether the Court can locate

---

[36] *John R. Ray & Sons*, 923 S.W.2d at 87 (providing that severability clause cannot save a contract if the severed portion is "integral to the entire contract").

[37] There are 43,560 square feet in an acre of land.

[38] Pl.'s Ex. B at p. 3 (Interrogatory No. 1).

[39] *See David J. Sacks, P.C. v. Haden*, 266 S.W.3d 447, 450 (Tex. 2008) (per curiam).

[40] *Sanchez v. Barragan*, 624 S.W.3d 832, 840 (Tex. App.—El Paso 2021, no pet.); *see, e.g.*, *Loeffler v. Lytle Indep. Sch. Dist.*, 211 S.W.3d 331, 346–47 (Tex. App.—San Antonio 2006, pet. denied) (holding that a contract to sell land was unenforceable because it did not contain a sufficient description of land); *Joplin v. Nystel*, 212 S.W.2d 869, 872 (Tex. App.—Amarillo 1948, no writ) (holding that contract with only a "partial description of the land" was unenforceable).

an adequately described pocket of acreage somewhere within the contemplated transaction. It is whether the Agreement identifies its only defined object of sale—"the Land"—with enough certainty for the Court to determine what Village Crossing promised to convey.

¶ 31.  It does not. The Agreement's text provides no means of locating the northern boundary of the interior acreage. While Village Crossing's planning materials place that boundary along Reserve P and Reserve Q,[41] the Agreement itself fails to identify those reserves, describe their boundaries, or incorporate an existing writing that does. Nor does Exhibit A provide the courses, distances, or other data needed to locate the missing line. Without that data, neither a surveyor nor the Court can determine from the four corners of the contract where "the Land" ends and Village Crossing's retained property begins.[42]

¶ 32. West Creek does not seriously dispute any of this. Instead, it acknowledges "some ambiguity" regarding the interior acreage but attempts to confine the problem to what it calls the "Back Property."[43] That argument, however, rests on a premise the Court has already rejected—that the Agreement created two severable conveyances. The Agreement does not define a "Frontage

---

[41] Pl.'s Ex. A-2.
[42] *Fischer v. CTMI, L.L.C.*, 479 S.W.3d 231, 237 (Tex. 2016) ("[T]he agreement's terms must also be sufficiently definite to enable a court to understand the parties' obligations, and to give an appropriate remedy if they are breached." (cleaned up)).
[43] *See* Resp. ¶ 18.

Property" and a "Back Property." It defines only "the Land."[44] And because the contract provides for a single, unified sale, an incomplete boundary for a portion of the property means the boundary of "the Land" itself is incomplete. One cannot identify a unified parcel with reasonable certainty while leaving an entire edge of it open to later selection.

¶ 33.  Nor can Section 5.2 be read to grant West Creek an implicit, unilateral power to draw the missing boundary through its own surveyor. That provision requires West Creek to obtain "a new survey . . . to compute the number of gross square feet *in the Land*"—a mathematical measuring function, not a boundary-drawing one. The clause presupposes that the Land's boundaries are already fixed and instructs a surveyor to calculate the area within them. Nothing in that language authorizes West Creek to decide, after the fact, where those boundaries run.

¶ 34.  Consequently, one dispute the Court can comfortably leave unresolved is whether the frontage component, viewed in isolation, would satisfy the certainty requirements for land descriptions despite Exhibit A's contradictory references to "+/-1.1 AC" and the boundaries of the 2.0644-acre Tract 5-F.[45] Even assuming the

---

[44] Agreement § 2.1.

[45] The summary-judgment record confirms the confusion evident from the face of Exhibit A. West Creek's representative, Michael Pittman, II, states that West Creek understood it was purchasing the entire platted frontage lot, while Village Crossing's representative, Frank Alattar, states that Village Crossing understood it was selling roughly half of it—approximately 1.1 acres of a 2.0644-acre parcel. *See* Def.'s Ex. 1 (Pittman Decl.) ¶ 5; Alattar Decl. ¶ 10. Both competing interpretations trace back to the same page: the "+/- 1.1 AC" label points one way, and the bold outline of the full platted tract points the other. Ex. A to Agreement. When a single exhibit sends two sophisticated commercial parties in opposite directions, the writing has failed at its most basic task.

frontage component could be identified with reasonable certainty on its own, the Agreement did not make it an independent object of sale or assign it a stand-alone price. Its description therefore cannot rescue the incomplete description of the single "Land" the parties agreed to convey.

¶ 35. The Court therefore **GRANTS** summary judgment declaring the Agreement unenforceable in its entirety for indefiniteness.

**C.    For related but independent reasons, the Agreement also violates the statute of frauds.**

¶ 36. Indefiniteness and the statute of frauds ask related but distinct questions. Indefiniteness asks whether the parties ever reached agreement on the essential terms of their transaction. The statute of frauds asks whether those terms were memorialized in a signed writing that the law will actually enforce. Thus, even if Village Crossing and West Creek shared a flawless unwritten understanding of the property they intended to convey, that understanding does not equate to an enforceable contract unless the property can be identified with reasonable certainty from the writings themselves.

¶ 37.   Texas Business and Commerce Code Section 26.01 requires a contract for the sale of real property to be in writing and signed by the party to be charged. As to the property description, the writing must furnish, within its four corners or by reference to an existing writing, the means to identify "the land to be conveyed"

with reasonable certainty.[46] Because the Agreement creates one integrated sale, that certainty requirement applies to "the Land" as a whole, not merely to whichever slice of it a party would prefer to salvage.

¶ 38. To be sure, the writing need not contain a formal metes-and-bounds description,[47] nor must it identify the property without any resort to outside evidence.[48] If the writing contains a sufficient "nucleus of description," extrinsic evidence may explain its descriptive terms and apply them to the ground.[49] But the distinction between explanation and creation is critical: extrinsic evidence may identify the land from data contained in the writing, but it may not supply the essential descriptive data the writing lacks.[50] As *Morrow* put it, parol evidence may add explanatory detail, but it may not provide the "framework or skeleton" of the description.[51]

¶ 39. The Agreement fails this standard for two reasons. First, because it omits the northern boundary line altogether, its four corners cannot identify "the Land" with reasonable certainty. Neither the Agreement nor Exhibit A identifies

---

[46] Tex. Bus. & Com. Code § 26.01(a), (b)(4); *Wilson v. Fisher*, 188 S.W.2d 150, 152 (Tex. 1945); *Morrow*, 477 S.W.2d at 539–40.

[47] *Tex. Builders v. Keller*, 928 S.W.2d 479, 481 (Tex. 1996) (per curiam) (citing *Morrow*, 477 S.W.2d at 539).

[48] *See Morrow*, 477 S.W.2d at 539 ("To be sufficient, the writing must furnish within itself, or by reference to some other existing writing, the means or data by which the land to be conveyed may be identified with reasonable certainty.").

[49] *Dayston, LLC v. Brooke*, 630 S.W.3d 220, 225 (Tex. App.—Eastland 2020, no pet.).

[50] *Long Trs. v. Griffin*, 222 S.W.3d 412, 416 (Tex. 2006) (per curiam); *see Tex. Builders*, 928 S.W.2d at 481 ("Parol evidence may be used to explain or clarify the written agreement, but not to supply the essential terms.").

[51] *Morrow*, 477 S.W.2d at 541 (quoting *Wilson*, 188 S.W.2d at 152).

Reserve P or Reserve Q, describes their boundaries, or incorporates an existing writing that does. The location of that boundary therefore cannot be derived from the Agreement's descriptive data. It must be supplied from somewhere else.

¶ 40. Second, the Agreement's proposed cure is a promise rather than a description. Exhibit A explicitly acknowledges that its property description "may be legally insufficient" and provides that a future survey "shall become the legal description of the Property" and "shall replace this Exhibit A in its entirety." This language promises that a sufficient description will be created later. It did not furnish one when the parties contracted.

¶ 41. The statute of frauds does not permit a legal description to be supplied after the fact. The writing itself—or some other writing already in existence when the parties sign—must do that work. Texas law has long held that a future-survey arrangement does not satisfy the statute of frauds.[52]

¶ 42. *Dayston* is closely on point. There, the agreement described a portion of the property as "+/- 81.50 AC" of a larger survey and stated that the acreage "is being surveyed and renamed," with the title company to "convey the new legal address once completed."[53] The court held the description insufficient, explaining

---

[52]*Dayston*, 630 S.W.3d at 224–26 (holding that contract violated statute of frauds when it described land by reference to a future survey, because "any documents referred to and incorporated in the contested agreement must be in existence at the time the parties executed the contested agreement"); *accord Reiland v. Patrick Thomas Props., Inc.*, 213 S.W.3d 431, 437–38 (Tex. App.—Houston [1st Dist.] 2006, pet. denied);, *Lawler v. Dixtor Int'l (U.S.), Inc.*, No. 05-97-00286-CV, 1999 WL 588097, at *2–3 (Tex. App.—Dallas Aug. 6, 1999, no pet.).
[53] *Dayston*, 630 S.W.3d at 222.

that any document incorporated to identify the property "must be in existence at the time the parties executed the contested agreement."[54] A survey not yet completed cannot supply what the signed contract omitted.

¶ 43. West Creek's fallback position—that Section 5.2 gave it an implied right to select the missing boundary through its own survey—fares no better under the statute of frauds than it did under ordinary indefiniteness principles. Texas law recognizes a narrow exception under which a contract can satisfy the statute without describing the exact parcel conveyed, but only if (1) the larger parent tract from which the selection is to be made is itself "specifically and accurately described," and (2) the buyer holds "the unqualified right to select the land, thus prescribing a method of certain and final identification."[55] In that rare circumstance, the writing supplies a "definite mode of ascertaining" the property requiring no further agreement or approval.[56]

¶ 44. *Stekoll* illustrates both the exception and its strict limits. There, the contract failed the "unqualified right" prong of the exception. Although it granted the buyer the right to select 4,000 acres out of a well-defined 5,000-acre block, it

---

[54] *Id.* at 224–26.

[55] *See Stekoll Petroleum Co. v. Hamilton*, 255 S.W.2d 187, 191 (Tex. 1953); *Williams v. Ellison*, 493 S.W.2d 734, 737-38 (Tex. 1973) (larger tract must be described "with reasonable certainty"); *accord Lawler*, 1999 WL 588097, at *4 (larger tract must be "specifically defined"); *Ogilvie v. Hill*, 563 S.W.2d 846, 848 (Tex. App.—Texarkana 1978, writ ref'd n.r.e.) (recognizing exception to statute of frauds "which allows a purchaser of an undescribed portion of the seller's larger described tract to select and locate the portion so conveyed").

[56] *Stekoll*, 255 S.W.2d at 191.

tethered that selection right to a vague condition requiring the buyer to leave the sellers' remaining 1,000 acres "equitably checker-boarded."[57] Without either a fully specified parcel or an unqualified method for selecting one, the writing supplied no certain means of final identification.[58]

¶ 45.  West Creek's position satisfies neither prong of this exception. First, unlike the contract in *Stekoll*—which at least pinned down the boundaries of the parent 5,000-acre block—this Agreement completely fails to describe the larger geographic area from which West Creek's selection could operate. Reserve P and Reserve Q—the adjoining properties into which West Creek's survey extended—are not identified in the Agreement at all. Their dimensions and locations appear only in materials that the Agreement neither identifies nor incorporates.[59] The Agreement therefore provides no ascertainable source tract within which a selection right could operate.

¶ 46.  Second, Section 5.2 does not grant West Creek an unqualified right of selection, expressly or by implication.[60] The plain language of the provision requires West Creek to obtain "a new survey . . . to compute the number of gross square feet in the Land." The object of the survey is "the Land," a term already defined in

---

[57] *Id.* at 190–91.
[58] *Id.* at 191.
[59] Pl.'s Ex. A-2.
[60]  *Harkins v. N. Shore Energy, L.L.C.*, 505 S.W.3d 1, 12 (Tex. App.—Corpus Christi-Edinburg 2014) (mem. op.) (providing that selection agreement may be found by implication), *aff'd on other grounds*, 501 S.W.3d 598 (Tex. 2016) (per curiam).

Section 2.1 as "approximately 11.56 +/- acres" depicted on Exhibit A. The surveyor's assigned task is merely "to compute" the square footage within that predefined space. Nothing in Section 5.2 authorizes West Creek to unilaterally decide how much of Village Crossing's adjoining property to absorb, where the northern boundary should run, or which remaining acreage Village Crossing must retain.

¶ 47. In the end, West Creek's selection theory simply repackages the same impermissible promise to agree later. The Agreement neither describes the full property to be conveyed nor furnishes a definite contractual method for identifying it. The geographical data can only be supplied by a future survey operating outside the writing. The statute of frauds does not allow that survey to become the bargain itself.

¶ 48. The Agreement is therefore void under the statute of frauds, and Village Crossing's Motion is **GRANTED** on that independent ground.

**D.     Alternatively, even if the Agreement were enforceable, West Creek materially breached it.**

¶ 49. Either of the rulings detailed above is sufficient, on its own, to dispose of West Creek's counterclaims for breach of contract and specific performance. A party cannot recover for a breach of, or compel performance under, an agreement

that never achieved legal enforceability in the first place.[61] Nevertheless, because Village Crossing moved for summary judgment in the alternative on the issue of prior material breach, the Court will assume—solely for this alternative analysis— that the Agreement is valid and will evaluate whether West Creek materially breached it.

¶ 50.  That assumption does not alter the Agreement's structure. Section 2.1 specifically defines the property to be conveyed as "the Land," consisting of "approximately 11.56 +/- acres" depicted on Exhibit A. Section 5.2 then requires West Creek to obtain a survey "to compute the number of gross square feet *in the Land*." This terminology is important. Section 2.1 defines the property; Section 5.2 measures it. Under Texas law, contractually defined terms are virtually conclusive when discerning intent, and courts are prohibited from substituting alternative language for a defined term.[62] The survey provision therefore does not give a buyer or its chosen surveyor a second opportunity to dictate what property was actually bought and sold.

¶ 51.  Exhibit A's statement that a compliant survey would "replace" Exhibit A does not support a different reading. Contractual provisions must be harmonized,

---

[61] *McAllen Hosps., L.P. v. Lopez*, 576 S.W.3d 389, 392 (Tex. 2019) (party bringing breach-of-contract claim must prove existence of valid contract); *Abraham Inv. Co. v. Payne Ranch, Inc.*, 968 S.W.2d 518, 527 (Tex. App.—Amarillo 1998, pet. denied) ("A purchaser of real estate is entitled to specific performance of a contract for sale of land when the contract is valid and enforceable . . . .").
[62] *Sundown Energy LP v. HJSA No. 3, Ltd. P'ship*, 622 S.W.3d 884, 888 & n.15 (Tex. 2021) (per curiam).

not placed in competition.[63] Read in tandem, Sections 2.1 and 5.2 require the survey to provide the final legal description of the property already defined as "the Land." Reading Section 5.2 as West Creek suggests—making any property selected by its surveyor the contractual "Land"—would entirely erase Section 2.1's definition and leave the surveyor's authority without any discernible limit. A survey may memorialize an agreed property more precisely, but it cannot unilaterally enlarge the conveyance. Here, West Creek's surveys exceeded the stated acreage by more than two acres—or roughly 17%—and extended the interior property into Reserve P and Reserve Q. Nothing in the Agreement authorized either departure.

¶ 52. The summary-judgment record leaves no genuine dispute about why performance failed, and it was not a simple misunderstanding. When Village Crossing objected that the submitted surveys did not depict "the Land," West Creek made no effort to reconcile its work with Section 2.1's 11.56-acre parameters. Instead, it doubled down, insisting that Village Crossing had no right to reject the surveys and that whatever acreage its surveyor chose to draw was "the Land" by definition. This stubborn posture transformed a routinely curable surveying discrepancy into an absolute refusal to perform the core obligation imposed by the contract.

---

[63] *See Italian Cowboy*, 341 S.W.3d at 333.

¶ 53. Section 12.7 reinforces the point by making time "of the essence," necessitating strict performance of the Agreement's deadlines.[64] West Creek failed to deliver a conforming survey by the extended deadline of June 23, 2025.[65] Following Village Crossing's notice of default on October 1, 2025, Section 10.1 granted West Creek three business days to remedy the problem. West Creek used that cure period to resend the same surveys. Village Crossing terminated the next day.

¶ 54. Consequently, even assuming the Agreement is enforceable, West Creek's refusal to deliver a conforming survey constitutes a material breach.[66] And because the Agreement is one contract, not a bundle of severable conveyances,[67] that material breach discharged Village Crossing from any remaining obligation to close and entitled it to terminate the Agreement outright.[68] A party that materially breaches a contract cannot turn around and compel specific performance.[69]

---

[64] *Lyons v. Ortego*, No. 01-17-00092-CV, 2018 WL 4014218, at *6 (Tex. App.—Houston [1st Dist.] Aug. 23, 2018, pet. denied) (mem. op.).

[65] Pl.'s Ex. A-5.

[66] *See Mustang Pipeline Co. v. Driver Pipeline Co.*, 134 S.W.3d 195, 199–200 (Tex. 2004) (per curiam).

[67] *Tex. Auto Co. v. Arbetter*, 1 S.W.2d 334, 339 (Tex. App.—San Antonio 1927, writ dism'd w.o.j.) ("There is nothing in the contract or the conduct of the parties indicating any intention to treat the obligations of the parties as severable with reference to the two tracts. On the contrary, it is apparent that the transaction was not intended to be severable, and, as a practical matter, is not so.").

[68] *Mustang Pipeline*, 134 S.W.3d at 196 ("It is a fundamental principle of contract law that when one party to a contract commits a material breach of that contract, the other party is discharged or excused from further performance.").

[69] *Glass v. Anderson*, 596 S.W.2d 507, 513 (Tex. 1980) ("A party who asks a court of equity to compel specific performance of a contract must show his own compliance with the contract. . . . A party cannot be permitted to materially and totally breach his contract, wait until he sees that his bargain will be profitable, and then ask the aid of a court of equity to require the innocent party to perform that contract.").

¶ 55. Accordingly, even if the Agreement were enforceable, Village Crossing would be entitled to summary judgment on West Creek's counterclaims for breach of contract and specific performance because West Creek materially breached the Agreement first. Village Crossing's Motion is **GRANTED** on that alternative ground.

**E.    Evidentiary Objections.**

¶ 56. Village Crossing objects to Paragraph 11 of the Declaration of Michael Pittman II, which asserts that Village Crossing sent its termination notice only "after receiving" a second survey of the interior property. West Creek's own evidence disproves this timeline. The field-note description attached as West Creek's Exhibit 5 is dated October 8, 2025—one day after Village Crossing terminated on October 7, 2025. An affiant's statement that is directly contradicted by the party's own documentary evidence does not create a genuine issue of material fact and may be disregarded.[70] The Court therefore **SUSTAINS** the objection to Paragraph 11's sequencing of events.

¶ 57. Village Crossing also objects to Paragraphs 7 through 9 and Paragraph 13 of Pittman's declaration, which describe West Creek's surveys as "consistent with the Agreement." Whether the surveys complied with the contract is a question of law for the Court, not a fact a witness can settle by announcing his own legal

---

[70] *Lujan v. Navistar, Inc.*, 555 S.W.3d 79, 88, 90–91 (Tex. 2018).

conclusions. The Court **SUSTAINS** the objection to those legal conclusions but **OVERRULES** the objection as to the remaining factual assertions in the declaration, all of which the Court has considered.

## CONCLUSION AND JUDGMENT

¶ 58. For the reasons explained, Village Crossing's Traditional Motion for Summary Judgment is **GRANTED**, and its objections to the Declaration of Michael Pittman II are **SUSTAINED IN PART** and **OVERRULED IN PART**. Accordingly, the Court ORDERS as follows:

(a) The Purchase and Sale Agreement is one contract for the sale of one defined parcel of real property—the "Land"—and not two severable conveyances. Because the Agreement does not furnish a legally sufficient description of that property, it is unenforceable for indefiniteness and is independently void under the statute of frauds.

(b) Because no enforceable contract exists, West Creek's counterclaims for breach of contract and specific performance are **DISMISSED WITH PREJUDICE**.

(c) Alternatively, even if the Agreement were valid and enforceable, West Creek materially breached its obligations under Section 5.2 by refusing to provide a survey conforming to the Agreement, even after notice of default and an opportunity to cure. Village Crossing therefore properly terminated the Agreement on October 7, 2025. West Creek's counterclaims would fail on this alternative ground as well.

(d) Village Crossing's objections to the Declaration of Michael Pittman II are **SUSTAINED** as to Paragraph 11 and as to the legal

conclusions in Paragraphs 7 through 9 and Paragraph 13. The objections are otherwise **OVERRULED**.

(e)     Village Crossing's request to recover the $55,000 earnest money as liquidated damages under Section 10.1 of the Agreement, together with attorneys' fees and expenses under Section 10.3 of the Agreement and Chapter 38 of the Texas Civil Practice and Remedies Code, is **DENIED**. Those remedies depend upon the existence of an enforceable contract, and the Court has concluded that none exists.

¶ 59.   With the exception of Village Crossing's request for attorneys' fees under the Declaratory Judgment Act, TEX. CIV. PRAC. & REM. CODE § 37.009, this Order disposes of all claims and counterclaims asserted by and between the parties.

¶ 60.   The Court directs Village Crossing to file its application for statutory attorneys' fees and costs, if any, together with its proposed final judgment, within 20 days of the date of this Order.

SO ORDERED.

_____
Hon. Brian Stagner
Judge of the Texas Business Court,
Eighth Division, *sitting by assignment in the Eleventh Division*

SIGNED: July 22, 2026